## SMITH et al. v. JASPER COUNTY LUMBER CO.

### No. 2192.

Court of Civil Appeals of Texas. Beaumont. Feb. 20, 1932.

Rehearing Denied Feb. 24, 1932.

Garland Smith, of Jasper, and C. A. Lord, of Beaumont, for plaintiffs in error.

Lewis Lanier, of Jasper, for defendant in error.

O'QUINN, J.

Defendant in error sued plaintiffs in error in the district court of Jasper county. It alleged that it was a corporation incorporated under the laws of the state of Louisiana with a permit to do business in the state of Texas, and that its principal office and place of business was at Jasper, Jasper county, Tex., and that it was the owner of all the merchantable timber standing, lying, and being upon five certain tracts of land fully described in its petition, with the right until October 31, 1937, to enter upon said lands and cut and remove said timber therefrom. It further alleged that plaintiffs in error about December 20, 1930, entered upon said lands and had cut and removed therefrom approximately 15,000 feet of said timber of the value of $10 per thousand feet and had appropriated same to their own use and benefit, to its damage $150.

It was further alleged that plaintiffs in error were asserting some character of claim to said timber and were threatening to continue cutting and removing same and to appropriate same to their own use and benefit, and had so notified defendant in error.

It was further alleged that there was standing and growing upon said lands merchantable timber to the amount of 2,000,000 feet, which was the property of defendant in error, and that same was of the reasonable market value of more than $7,500. It was alleged in this connection that plaintiffs in error were not financially able to respond in damages for the value of timber cut by them, and prayed for a writ of injunction restraining them from cutting or removing any of said timber, and for judgment for the title and possession of said timber and for damages for the timber cut.

Plaintiffs in error answered by general denial, and specially, as follows:

"By way of special answer defendants rep-resent to the court that on the 31st day of October, 1922, they executed and delivered to A. J. Peavy, trustee, a deed to all the merchantable timber then standing, growing and being upon the land described in plaintiffs' petition, in consideration of the payment of $1.00 and other good and valuable considerations; that by way of mesne conveyances the Jasper County Lumber Company acquired whatever right and title that was conveyed by defendants by said deed to A. J. Peavy, trustee. That in said deed the following provisions were made:

" '1. It is understood and agreed that the grantee, his successors or assigns, shall have fifteen years from the date hereof in which to cut and remove said timber from said above described tract of land.

" '2. It is further understood and agreed that after the entry upon said land and the cutting and removal of said timber therefrom by the grantee, his successors or assigns, all of the right, title and interest whatsoever of grantee, his successors or assigns, shall revert to grantors, their heirs or assigns, except the right-of-way privileges herein conveyed.

" '3. It is further understood and agreed that when said grantee, his successors or assigns shall have cut over and abandoned said land one time, the timber then remaining thereon shall revert to grantors, their heirs or assigns.'

"Defendants represent to the court that plaintiff, in the exercise of its rights to cut and remove said timber, did go upon said land and cut over the same generally, cutting the various character and kinds of timber therein stipulated in said above mentioned deed prior to the time of the institution of this suit and abandoned said land. That by reason of said entry upon said land and the cutting over of same, and the abandonment of said cutting under the terms of said deed, the timber that was left thereon reverted to grantors, and is now the property of grantors, and was at the time of the institution of this suit, and at the time of the alleged entry upon said land and the cutting of said timber complained of in plaintiffs' original petition, the property of defendants.

"Defendants represent that by reason of the entry upon said land and the cutting of timber on same, and the abandonment of said cutting, and by reason of the reversionary clause in said deed, plaintiff has no further right in said timber, and the defendants are the sole and exclusive owners thereof.

"Wherefore, defendants pray the court that they go hence with their costs, and that the title to said timber be quieted in defendants, and that they do have and recover of and against plaintiff judgment for title and possession of all timber now standing, growing or being upon the land described in plaintiffs' petition."

The case was tried to a jury, and at the conclusion of the evidence both parties filed motion for an instructed verdict. Plaintiffs in error's motion was refused, and that of defendant in error granted, and the jury returned the following verdict: "We, the jury, find for the plaintiff for all the timber sued for." Judgment was entered for defendant in error for the timber and for $14.14 as damages for timber cut. The case is before us on writ of error brought by defendants below.

Plaintiffs in error's first and second assignments of error are to the effect that defendant in error, plaintiff below, having alleged that it was a Louisiana corporation with a permit to do business in Texas, with its principal office in Jasper, Jasper county, Tex., it was necessary for it to introduce proof in the manner required by law to show that it had a permit to do business in Texas, and having failed to offer such proof, it had no right to maintain the suit, and the court erred in instructing verdict for it, and in rendering judgment in its favor.

The allegation in defendant in error's petition reads: "Comes now Jasper County Lumber Company, a Louisiana corporation with a permit to do business in Texas, and with its principal office and place of business in Jasper, Jasper County, Texas, hereinafter called plaintiff." This is all the allegation relating to the character of defendant in error, or its activities. The effect of defendant in error's petition is set out in the opening statement of this opinion, supra.

The assignments are overruled. There is nothing in the petition to show that the corporation was doing business in Texas in violation of law. Where this is true, that defense cannot be invoked by exception, but must be pleaded. This was not done. Panhandle Telephone & Telegraph Co. v. Kellogg Switchboard & Supply Co., 62 Tex. Civ. App. 402, 132 S. W. 963 (writ refused); Oklahoma Tool & Supply Co. v. Daniels (Tex. Com. App.) 290 S. W. 727. The prohibition stated in article 1536, R. S. 1925, of the right of a foreign corporation to maintain any suit, whether legal or equitable, upon any demand, either arising out of contract or tort, unless at the time, such contract was made, or tort committed, the corporation had filed its articles of incorporation with the secretary of state, does not apply to all foreign corporations, but only to those desiring to transact business in this state. Unless the vice in plaintiff's case appears affirmatively in its petition, the failure to take out a permit is a defense to be pleaded by the defendant, and one, too, which, if not pleaded, is waived. 11 Tex. Jur. §§ 503, 505; Oklahoma Tool & Supply Co. v. Daniels (Tex. Com. App.) 290 S. W. 728; Barcus v. J. I. Case Threshing Machine

Co. (Tex. Civ. App.) 197 S. W. 478; U. O. Colson Co. v. Powell (Tex. Civ. App.) 13 S.W.(2d) 405; Blackwell-Wielandy Co. v. Sabine Supply Co. (Tex. Civ. App.) 38 S.W.(2d) 654.

The third assignment reads: "The evidence introduced upon the trial of this case conclusively showed that the plaintiff had entered upon the land in question and had cut and removed a large portion of the timber in question in this suit therefrom, and cut over the said timber, and had abandoned the land long before the filing of this suit, so that the plaintiff had forfeited all the right and title to the timber remaining on the land and such remaining timber had reverted to the defendants according to the terms and provisions of the defendants' timber deed under which the plaintiff asserted claim to the timber in question and which it introduced in evidence; and the court erred in refusing the defendants' motion for peremptory instruction to the jury to return the verdict for the defendants."

Defendant in error filed this suit January 5, 1931. In support of its alleged ground of action, it introduced in evidence a timber deed or contract dated October 31, 1922, whereby T. L. Smith and Marvin R. Smith, the plaintiffs in error here, sold and conveyed to A. J. Peavy, trustee, the merchantable timber standing, growing and being upon the tracts of land described in said deed or contract. By this timber deed the right to cut and remove the timber conveyed was limited to fifteen years from the date of the conveyance, and the conditions for the removal of the timber were fixed by the following provisions in the conveyance:

"It is understood and agreed that the grantee, his successors or assigns, shall have fifteen years from the date hereof in which to cut and remove said timber from said above described tracts of land.

"It is further understood and agreed that after the entry upon said land and the cutting and removing said timber therefrom by the grantee, his successors or assigns, all the right, title and interest whatsoever of grantee, his successors or assigns, shall revert to grantors, their heirs or assigns, except the right-of-way privileges herein conveyed.

"It is further understood and agreed that when said grantee, his successors or assigns, shall have cut over and abandoned said land one time, the timber then remaining thereon shall revert to grantors, their heirs or assigns."

Peavy, trustee, conveyed the timber to defendant in error, Jasper County Lumber Company, by deed dated April 2, 1923, together with the easements, rights of ingress and egress, and rights of removal of the timber.

Relative to the cutting of the timber, T. L. Smith, one of the defendants, testified: "I am one of the defendants in this case. My brother M. R. Smith, and I own the land on which the timber was sold to Mr. A. J. Peavy, trustee. * * * We are still the owners of the land. * * * I have had occasion to go over the land frequently in the last few years. I know that part of the timber has been cut from the land. The Jasper County Lumber Company cut it. * * * The oak has been cut without it is the ten acres on the west end of the Susan Glenn. * * * There has been some pine cut but there is very little pine on the land in question. Most of the pine on the land is large and scattered. Part of that has been cut. It has been cut in spots because it is only on the land in spots. It is mostly river bottom pine. The pine grows on high spots in the bottom. On the south side of the land they cut several pine trees, but on the north very little has been cut, and on the east very little has been cut. Mostly choice trees were cut. The other character of timber that has been cut from the land was oak and some black gum. They cut the oak generally, and it seems like the black gum was cut in spots. In some places on the land there is a right smart of gum. In other places it is very thin. The other character of timber which has been cut from the land is ash on what we know as the pasture. It has all been cut, which is the west end of the tract. * * * In 1922 the character of timber standing on this ground was mostly hardwood. There was very little pine. There was black gum, sweet gum, bay, oak, ash and some pine. Very little if any bay has been cut."

On cross-examination he testified: "At the time this deed in question was executed the merchantable timber consisted in pine and hardwood on the several tracts. The hardwood consisted of sweet gum, black gum, oak of every family, pine and ash. There was also a little beech and very little cypress. They (Jasper County Lumber Company) have entered upon the land more than one time for the purpose of cutting timber. * * * The first entry they made on the land they cut the oak. It went to dying and they began cutting it. It wasn't too far dead, but in order to save it from waste they cut it. They left some oak trees on the land. They cut everything that would make a stave at the time they went on there. * * * I don't think there are any trees on the land now that will make staves. * * * I don't remember when they cut the ash, but that must have been about the time they were working up the last staves. * * * I don't know whether the ash timber was dying or not when they cut it. * * * I stated that the pine timber was scattered here and yonder and that it was large timber used for bill stuff. The principal part of the pine timber was not dead. I couldn't say that they cut any dead pine timber. I couldn't give any definite estimate of the amount of the timber per acre that was conveyed by the deed exe-

cuted by myself and my brother Marvin in 1922 to Mr. Peavy. * * * I haven't any idea. I would not be in a position to give any idea as to how much timber now stands on the land. I would roughly guess there is something like half of the timber still standing on the land. The timber that is now on the land is the same timber that was conveyed in the deed made to Mr. Peavy dated October 31, 1922. * * * At least half of the timber still stands on the land."

Seymore Durdin, witness for plaintiffs in error, testified: "I am familiar with a part of the land from which the timber was sold by T. L. Smith and Marvin Smith, to Mr. A. J. Peavy, trustee. * * * There has been considerable part of the timber cut. The bulk of the land has been generally cut over. The character of timber that has been cut is white oak, ash and black gum. There was never very much pine in there. The pine grew on the land in spots. It seems that the best trees have been cut from the pine ridges. * * * I wouldn't think they have cut anything like half the pine. I figure that they have just cut bill stuff. There are places that they didn't cut any pine in spots. I don't think the same would apply to oak. The oak is cut pretty clean. I don't remember noticing any red gum or sweet gum having been cut. The ash seems to have been cut pretty close. I don't recall noticing any beech or gum being cut. There has been no cypress or magnolia cut that I know of. * * * I don't know whether any red oak at all has been cut. You might strike spots in considerable acreage over the entire tract of land that nothing at all has been cut. The timber that is now on the land is timber that was there on the 31st day of October, 1922. * * * I have had occasion to go over the land thoroughly within the last year or two, the principal part of it. * * * I have made observations with reference to cutting of the timber on the land. There has been considerable part of the timber cut. The bulk of the land has been generally cut over. The character of timber that has been cut is white oak, ash and black gum is the most that I recall. I think some pine has been cut. There was never very much pine in there. The pine grew on the land in spots. It grew on pine ridges. It seems that the best trees have been cut from the pine ridges. * * * I would not be able to tell what the timber would cut per acre now. I wouldn't say that considerably more than half of the timber is now standing. I don't know. * * * The biggest portion of the ash is gone. There is some ash left. Most of the ash was in one place. There were some ash scattered out over the land, but I think most of that is still there."

On cross-examination he testified: "Along about the time that this timber was being cut a good deal of it was dying. I don't know about the ash, the oak was dying about the time it was cut. I don't think the principal part of the timber was dying when it was taken off. It seemed to be lots of oak cut that didn't show to be dying. I was in there during the time they were working on it and they cut some that didn't show to be dying."

Marvin R. Smith, one of plaintiffs in error, testified: "As to the various cutting of the timber in question, the first time I knew anything about it they had a little tie mill that was supposed to be cutting dead timber. Uncle Horace Glenn come along and cut some pine, then John C. Cuncancia come in and cut staves. Then George Martindale come in behind John C. Cuncancia and made staves. I followed them. During the time I was there the ash all over the land was dying and Mr. Few come down and asked me what about cutting the ash and I said I didn't know about it, give me a few days to study about it. Finally in about three days I went to him and told him if he would give us $5.00 more on staves than others were getting we would cut the ash. Mr. Horace Glenn and me went on the land and marked the dead ash, or what was decayed. All ash in that country is decayed more or less. And later on Tommy Glenn cut some bill pine off of it. I cut some oak piling and cut a little timber off of the right-of-way that didn't amount to anything. The very best part of the timber has been cut all over the land. We were picking the timber to make staves. At first they picked the timber pretty close and got the dead stuff. Next time they cut some live timber and then they told us to cut anything that would make above fifty forty ft. staves. The last cutting done by the Jasper County Lumber Company was in the spring about a year ago now. I don't think they have gone back there since then. The first cutting that was made was for ties. The character of timber they were making ties into was oak. It was oak that wasn't fit for anything else. If it looked like it was decaying they cut it and made it into ties. It (the tie mill) was located on my brother's and my land. Mr. Horace Glenn had an agreement with me about putting in the tie mill and gave me $50.00 for putting in the tie mill. I didn't give him any right to cut the tie timber off that tract of land. After the tie timber had been cut, me, Tommy and Jim Smith, sold to Jasper County Lumber Company some land in there. They bought the land in fee but not as a part of the consideration for the cutting of this tie timber. The tie timber wasn't mentioned between Mr. Few and me in making the sale to Jasper County Lumber Company. * * * Nothing was said about the cutting of any other timber. Mr. Few paid me $5.00 more per thousand for staves than he was paying others. * * * I didn't tell him after we had sold him the land for him to go ahead since he had been so good and cut the timber whenever and wherever he

wanted to. * *· * I didn't make any such statement to him at all. * * * John Cuncancia went, I judge, all over the land when they first made the oak into staves. He didn't cut all the timber and make it into staves, if he had done that there would not have been any left for the rest of us to cut. He picked out the best. * * * Elvin Smith cut the dead oak. * * * They made staves from everything that would make them. They picked the timber. Had a man go through and tell them what to cut. I mean by picking the timber that when they first started off to make staves they got timber that was dying or would die within three or four years. There was some timber cut that had decayed places on it. * * * They made staves from everything that would make them. They got so much more money out of staves than they do ties. George Martindale followed John Cuncancia in cutting the staves. I don't know how many staves he made. I don't know approximately. Well, he had his. timber marked too, I thinw. * * * I made staves twice myself. ˋ I don't remember when I first made staves, but two years later I made staves again. * * * I don't know the approximate date that I last made staves on it. I couldn't say that it was last year or that it was year before last. I just know that I made staves twice. * * * I was working for the Jasper County Lumber Company. I did not make any claim either the first or second time I went on the land to make staves that the timber had reverted back to me. I don't want anything that don't belong to me. When we give them six or seven times that is enough. * * * I did not claim the balance of the timber reverted to us when John Cuncancia cut it nor when George Martindale cut it nor when I cut it the first time. I claimed that it reverted back to us after I cut it the second time. I went in there after that time as an employee of the Jasper County Lumber Company and cut some black gum. I carried it to the Jasper County Lumber Company. I did claim at that time that the timber had reverted back to us. I carried it to them because the two years had not run out. * * * John Cuncancia made staves all over the land I judge. George Martindale did the same thing, and I made staves over all of it the first time and the second time I also ·made staves on all of it. * * * I imagine I cut the black gum for the Jasper County Lumber Company in February or March of last year. * * * I don't think that the Jasper County Lumber Company has cut any timber from that tract of land since I cut the black gum. I am sure they have not. They told me to go anywhere that I could find black gum and cut it except on Mr. Minyard's tract. * * * We cut all the black gum we could find anywhere out there. * * * At the time we executed the deed to

Mr. A. J. Peavy, trustee, I do not know how much timber per acre was on the land. I· have no idea about it. * * * I cannot say what portion of the timber has been cut since the execution of the deeds. I cannot say that half of it has been cut. I don't know. It would have to be scaled before I would know. I would not say that as much as 15% of the timber has been cut. I would say that a right smart of the trees are gone from there. That is all I can say. The timber that is now remaining on the land is the same timber that was included in our deed to Mr. A. J. Peavy, trustee, dated October 31, 1922, except what has come up since then. I wouldn't think the timber that has come up since 1922 would be big enough to be merchantable timber now.".

A. A. Few, witness for defendant in error, testified: "I now have stock in the Jasper County Lumber Company. * * * I was manager of the organization until the 1st of November, 1929. I can locate most of the lines of the land upon which was situated the timber that Marvin and Tommy Smith sold to A. J. Peavy, trustee, consisting of approximately 400 acres involved in this suit. I am very well acquainted with it. I do recall Jasper County Lumber Company having placed a tie mill in that vicinity and made some of the timber into ties. That was done under my instructions. * * * They made no objections to me following the cutting of the timber. ·* * * The Jasper County Lumber Company did cut some oak timber for purposes other than ties. We cut what we called stave timber. It was reported to me that a good deal of timber was dying everywhere. Large trees seemed to be dying the worst and I got Uncle Willie Smith to go mark the trees on this particular land that he thought were dying. * * * When the timber was cut over they would come and tell me that more was dying and would have to be cut in order to make staves. I think we went over it four or five times. * * * We had permission, in this way, from Marvin Smith to go on the land and cut the timber. He was to get $5.00 extra per thousand for staves he contracted for. He was to get $5.00 extra per thousand for staves for giving permission to cut the stave timber or other timber that was likely to die. Marvin Smith made some of the timber into staves himself. Other than the tie timber and stave timber he cut some ash. It showed to be dying. * * * I had permission from Marvin Smith to cut it as timber that we cut. * * * The Jasper County Lumber Company cut some timber from the land. Mr. Glenn worked all over our land and as I told you previously a good deal of the timber was dying and I know that he cut some off of these tracts of land. I don't recall of Marvin Smith giving us permission to cut the dead pine timber. Mr. Glenn handled that. I have

been on these tracts of land prior to the first cutting of the timber. I would say there was around 8,000 ft. of merchantable timber per acre. Principally hardwood was growing on these tracts at the time I was on it. * * * The Jasper County Lumber Company did cut some pine timber from that land. Mr. Glenn looked after that. It was my understanding that it was dead pine timber. * * * According to my instructions the Jasper County Lumber Company cut mostly white oak and ash; there was also some pine cut but that was done under the supervision of Mr. Glenn. They also cut some black gum and magnolia, and I have been informed that some postoak was cut. The magnolia was cut shortly before this suit was filed. * * * I do not know of the Jasper County Lumber Company having cut any red gum, sweet gum, hickory, beech or tupelo gum. * * * No elm has been cut. * * * Up until the time I ceased to be manager I was claiming, on behalf of Jasper County Lumber Company, the balance of the timber on these tracts of land. It was my purpose to go upon the land and cut and remove the timber therefrom up to fifteen years, as specified in the deed. * * * I never had any intention, on behalf of Jasper County Lumber Company, to abandon this timber. * * * I stated a while ago that we made staves out of oak pretty well all over these tracts of land where large trees showed indication of dying. * * * In this section the pine and oak both started dying from the top of the trees. We tried to get all that kind of timber before it was ruined. We lost something like a million feet. There is a lot down there yet that we did not get. I did not mean to convey the idea that there was not some oak situated on most parts of all these lands in question. There is some acreage perhaps but no big surrounding places but what there is some oak more or less on it. There are places on this land that looks like the oak timber was cut clean for two or three acres, and there is in the pasture there a place or two that practically everything on it is cut. The timber there consisted mostly of this large oak. I would say that approximately one-sixth of the timber over these tracts of land has been cut. That would be about 15% of it. * * * I went on the land for the purpose of making this estimate last Monday. It is my belief that about 85% of the timber is still remaining on the land since the execution of the deed."

H. A. Glenn, witness for defendant in error, testified: "I am in the employ of the Jasper County Lumber Company as timber man. I have held this position for about eight years. I am familiar with the tracts of land upon which the timber in question is situated. There was something like 8,000 ft. of timber per acre on the land at the date of the execution of the deed from M. R. Smith and T. L. Smith to A. J. Peavy, trustee, October 31, 1922. The Jasper County Lumber Company has cut a portion of that timber. They cut a part of the ash, white oak, black gum, and some pine. I mean they cut a part of the ash, part of the oak, part of the black gum and part of the pine. * * * There has been more oak cut than any other class of timber. I would say that there is as much as 25% of the oak timber still standing on the land. I would say about the same percent of ash is still standing. I judge about 50% of the pine is still standing. I would say about 25% of the timber has been cut on these tracts of land since the date of the execution of the deed. * * * None of the red gum has been cut. There is some red gum over practically all of these tracts of land. Between one-third and one-fourth of all the timber on this land consists of red gum. None of the beech has been cut. Only just recently some magnolia was cut. Marvin Smith cut the magnolia just prior to the filing of this suit. He cut about 15,000 ft. of magnolia. I do not know of any hickory having been cut on this land. I do not know of any tupelo gum having been cut. To my own personal knowledge I do not really know who cut the black gum from this land. I do know who made the oak timber into staves. John Cuncancia, George Martindale and Marvin Smith made or had made the staves. John Cuncancia did the first cutting. He cut stuff that showed indication of decay, limbs in the top were dying, some of it practically dead, and some of it was dead. He cut the timber in the year 1926. George Martindale made the next cutting. That was in the fall of the same year. He cut the same character of timber that John Cuncancia cut. Then Marvin Smith made some staves. * * * It looked like the timber was still dying when Marvin cut it but my recollection is that he cut very good timber. It was not as bad as the others cut. There is not a great deal of timber still standing on these tracts of land that would make staves; there is some. * * * There was some pine cut. I cut some large pine from it and afterwards some bill pine was cut, then I think Marvin Smith cut some himself. He was working for the Jasper County Lumber Company at the time. I stated a while ago that my position with the Jasper County Lumber Company is looking after their land and timber interest. In a general way I have been looking after these particular tracts of land for them. * * * So far as I know the Jasper County Lumber Company still asserts its right and claim to the timber on these tracts. The Jasper County Lumber Company has not abandoned its right and claim to this timber. I would say that there is something like 80% of the timber still standing that was there at the date of the execution of the deed. * * * The only character of timber that has been cut was oak, ash and pine. I expect it would cut

a thousand ft. of black gum per acre. * * * I judge it would cut somewhere in the neighborhood of 2500 ft. of red gum per acre. About the same of white gum per acre as black gum. There is not a great deal of cypress on the ground. It would probably cut a hundred or two hundred. ft. to the acre. It would cut just a small amount of hickory per acre. * * * I don't really know how much ash was cut off this land but I figure about 75% of it. There was not over 400 or 500 ft. of tupelo gum on the land."

J. P. McMahon, witness for defendant in error, testified: "My occupation is land surveyor and timber estimator. I have been in that business for about thirty-two years. I was called upon to look over some tracts of timber on behalf of Jasper County Lumber Company. * * * I did that Monday of this week. I was sent down there to make an estimate of the timber that had been cut from the 408 acres of land. Mr. H. A. Glenn was with me. * * * I counted the stumps as I found them on about 30 acres of the 408 acres. I counted the stumps on that number of acres. I can give you an idea about the portion of timber that has been cut from the land. I tried to take into count the size of the stumps as I went through. I judge that there has been 244,000 ft. of white oak, 180-000 ft. of ash, 50,000 ft. of pine, 200,000 ft. of black gum, 30,000 ft. of red oak, making a total of 524,000 ft. of timber cut from the land. I figure that for the entire 408 acres. I didn't make an estimate of the standing timber. It rained just about the time we finished this investigation, though in a general way I tried to keep track of the standing timber and I figure that perhaps there is two million ft. of merchantable timber standing on the ground now. I judge that about 20% of the original timber has been cut. With reference to the merchantable timber that is standing on the land now, it was there when the deed was executed October 31, 1922. I did not notice any portion of the land from which no oak was cut. Perhaps we would go a hundred yards sometimes where I wouldn't find any stumps but apparently where the white oak grew it seems to have been cut. That is, the large white oak. There is some white oak left now. I did not find where any red gum had been cut from the land. I found only one hickory stump. It was small and I didn't count it. * * * There was quite a bit of ash left standing that is merchantable. * * * The large red oak was not cut. * * * I did not find but very little cypress cut, I saw some elm but didn't find any cut. I didn't find any beech cut. I saw a few magnolia stumps but didn't include them. I understand that the magnolia was freshly cut. I never made any actual examination of the timber other than that just outlined to the jury. I just estimated the timber that was cut on about 30 acres or

around 4,000 vrs. through the block. I made my estimate as to the total amount of timber cut from the land based on the percentage of the 30 acres I went over. My estimate of the total of approximately 524,000 ft. of timber that was cut was made on the same basis. * * * There is an aggregate of 408 acres on the surveys. I actually saw about 30 acres. That left 378 acres that I did not make an estimate of the timber on. It is possible that all, or a great percent of the timber on that 378 acres could have been cut that I did not see. I understand that the white oak and ash had been cut over the entire tract. There is no particular portion of that 408 acres that some timber has not been taken from, that is, the ash and white oak. I found the ash to be larger in the west and northwest portion of the tract. * * * At the northwest part of the tract we found considerable ash in a body that was cut."

H. A. Glenn, recalled, testified: "I have just heard Mr. McMahon testify about he and I going upon the land involved in this suit on Monday of last week. I am familiar with all these tracts of timber on the ground. Taking the course which I ran the compass for him when he was making his check, we passed through a general average of cutting of the timber. We did go through some of the heaviest parts of the timber."

W. A. Latham, witness for defendant in error, testified: "I am manager of the Jasper County Lumber Company. I have held that position for a little better than a year. * * * Since I have held the position of manager I have claimed this tract of timber in their behalf. The Jasper County Lumber Company has been rendering and paying taxes on these tracts of timber since I have been with them. It is my purpose on behalf of the company to go upon the land and cut such timber as is mechantable therefrom prior to the expiration of the time limit specified in the deed."

W. G. Smith, witness for plaintiff in error, testified: "I am employed by the Jasper County Lumber Company. I have been working for them ever since the company was organized. I am looking after the timber. I am familiar with the land and timber on this 408 acre tract. I have had nothing to do with the cutting of the timber on this land except to mark the stave timber for them about three times at different times. I don't think I had anything to do with the cutting of the staves. * * * I marked the trees that ought to be cut three times. * * * There has been some of this timber cut by the Jasper County Lumber Company since they bought it from Marvin Smith and Tommy Smith. I would think something like one-fourth of it has been cut but I am not an estimator. I would judge about one-half the ash timber has been cut. * * * I am still

looking after it for them. I am still claiming this timber for them. I think there is at least 75% of the timber that was on the land when Tommy and Marvin Smith sold it to Jasper County Lumber Company still standing on it."

■ The deed under which defendant in error holds the timber conveyed all the merchantable timber standing or growing on the land. This consisted of pine, various kinds of oak, ash, various kinds of gum, beech, magnolia, hickory, white bay, and cypress, with fifteen years from the date of the deed (10–31–22) to cut and remove said timber. As noted, supra, the deed provided that after the owner of the timber had entered upon the land and cut and removed said merchantable timber, all of 'the right, title, and interest of said owner should revert to the grantors, plaintiffs in error here, except right of way privileges. And, as if to make the terms of the conveyance more certain, the conveyance further stipulated that "it is further understood and agreed that when said grantee, his successors or assigns, shall have cut over and abandoned said land one time, the timber then remaining thereon shall revert to grantors, their heirs or assigns."

From the evidence, supra, it appears that defendant in error at different times entered upon the land and cut some timber, but it is without dispute that there was never a general cutting of all the timber conveyed, or of all the kinds of merchantable timber sold. The cuttings were for special purposes to secure and preserve certain of the timbers and not a general cutting over of the land. It is not questioned but that much, several million feet, of the timber sold still remains on the land, and the time limit for its removal has not expired. We think it plain that plaintiffs in error sold and intended for the purchaser to have all the merchantable timber—of the various kinds—situated on the land, and that the purchaser, or his assigns, should have fifteen years, if necessary, in which to cut and remove said timber, and that the clause in the conveyance providing that, when the owner of the timber had cut over and abandoned the lands one time, all the remaining timber should revert to the grantors or their heirs or assigns, was intended to prevent the purchaser of the timber going on the land and cutting the timber and then holding the timber rights for a number of years, and, before the expiration of the time limit, going back and again cutting timber that had grown to be merchantable since the first cutting. We do not think the words "cut over and abandoned said land one time," or the other expression in the conveyance, "after the entry upon said land and the cutting and removal of said timber therefrom, all right, title and interest of the grantee shall revert to the grantors," meant that when one kind of timber, or a portion of one kind of timber, or a special grade of any of said timber, only was cut, unless all the other kinds of timber or the whole of the merchantable timber on the land were cut at the same time, that the right to cut same within the time limit named in the contract was lost, but that, when the timber sold (pine and various kinds of hardwood) was cut and removed, then the land would be "cut over" and the right exhausted. Cammack v. R–L Lumber Co. (Tex. Civ. App.) 258 S. W. 488, 490 (writ refused).

It is not contended by plaintiffs in error that all of the land has been cut over, or that all of the merchantable timber sold has been cut, but their contention is that, as defendant in error had at different times entered upon the land and cut portions of the timber and then ceased, this worked an abandonment of the timber rights under the contract of sale, and the remaining timber reverted to them, although the time limit for the removal of the timber had not ended. This contention is not sound. In the Cammack Case above cited the contract of sale and the facts are practically on all fours with the instant case. There, in discussing the question of forfeiture here involved, it was said:

"The contract does not provide that all the timber sold should be cut at one continuous cutting, nor that, when one kind of timber was cut, unless all the other kinds were cut at the same time, they could not be cut afterwards. It is without dispute that no pine nor ash nor gum nor hickory nor cypress was cut, and yet all of these that were merchantable were sold, and appellant received the cash therefor. That interpretation of contracts should be given as will carry out the intention of the parties, and if it be that the clause under consideration is of doubtful meaning, or is susceptible of being construed either as contended by appellant or by appellee, in such case the construction most favorable to the grantee must be given. We do not think it clear and certain that the parties intended that if any timber should be cut and removed before the expiration of the time limit, or that if just one kind of the merchantable timber sold should be cut and removed, that all of the other kinds of timber sold remaining upon the land, although the time limit for removal had not expired, was forfeited under the contract. In such case the rule is well settled that the doubt should be resolved in favor of the grantee.

"This is not a suit to restrain appellee from cutting the timber because of the lapse of the time given in which to cut and remove it, but is a suit to enforce a claimed forfeiture under the contract of sale. Forfeitures are harsh and not favored by the law, and, if the language used by the parties in contracting is fairly susceptible of an interpretation which will prevent a forfeiture, it will be so construed."

The Cammack Case, supra, went to the Supreme Court on an application for writ of error, and the writ was refused. The holding in that case rules the instant case.

As plaintiffs' fourth, fifth, sixth, seventh, and eighth assignments, in different forms, in effect, present the question here discussed, what we have said disposes of them, and they are overruled.

We do not think the contention of plaintiffs in error finds support in the record, and therefore the judgment is affirmed.